**In the Matter of The CENTRAL RAILROAD COMPANY OF NEW JERSEY, Debtor.**

**Bankruptcy No. 401–67.**

United States District Court, D. New Jersey.

Feb. 8, 1985.

See also, D.C., 38 B.R. 686.

Carpenter, Bennett & Morrissey by Stanley Weiss, Dean R. May, Newark, N.J., for Central Jersey Industries, Inc.

Crummy, Del Deo, Dolan & Purcell by Michael R. Griffinger, Paul R. DeFilippo, Newark, N.J., Rogers & Wells by Donald F. Luke, John M. Quitmeyer, New York City, for Oppenheimer & Co., Inc.

Richard K. Willard, Acting Asst. Atty. Gen. by Michael F. Hertz, Alan E. Kleinburd, Dept. of Justice, Washington, D.C., for the Government.

Irwin I. Kimmelman, Atty. Gen. of New Jersey by Joseph L. Yannotti, Deputy Atty. Gen., Trenton, N.J., for the State of N.J.

Estelle Flynn, Asst. City Atty., Bayonne, N.J., for the City of Bayonne, N.J.

Ball, Janik & Novack by Kenneth M. Novack, Portland, Or., for Messrs. Schnitzer.

## OPINION

CLARKSON S. FISHER, Chief Judge.

### I. *Introduction*

#### A. *Factual Background*

On March 27, 1967, the Central Railroad Company of New Jersey (CNJ) filed for reorganization under section 77 of the former Bankruptcy Act. Thereafter, CNJ was operated as a railroad by a succession of trustees. On April 1, 1976, Consolidated Rail Corporation (Conrail) acquired virtually all of the CNJ rail system pursuant to the Regional Rail Reorganization Act of 1973, as amended, 45 U.S.C. § 701 *et seq.* (the Rail Act).

This court approved a plan of reorganization of CNJ (the Reorganization Plan) in July 1979, *In the Matter of the Central Railroad Company of New Jersey,* 473 F.Supp. 225 (D.N.J.1979), and on September 13, 1979, entered an order providing for the approval, confirmation, and consummation of the Reorganization Plan (order No. 965). The following January, order No. 965 was affirmed by the Third Circuit. Under the Reorganization Plan, the reorganized company, Central Jersey Industries, Inc. (CJI), has issued certain notes to claimants, creditors and stockholders of CNJ, which were secured primarily by the value of the consideration received by CJI for the rail assets transferred by CNJ to Conrail.

At the time the Reorganization Plan was consummated, proceedings to determine the value of these assets were already underway in the special court established by the Rail Act (the Valuation Case), and CJI assumed CNJ's right to prosecute these claims. In addition to the Valuation Case, two other claims involving the value of CNJ's assets were pending in the New Jersey state courts when the Reorganization Plan was consummated. These claims sought to recover amounts in excess of deposits previously made by the State of New Jersey in the course of condemning approximately 350 acres of land formerly owned by CNJ in Jersey City, taken for the development of Liberty Park, and approximately 50 acres of land in Elizabeth, taken for the construction of a New Jersey Turnpike interchange (the Condemnation Cases). These amounts exceeding the deposits made by the state (the Condemnation Proceeds) were also used to secure certain of the notes issued by CNJ under the Reorganization Plan.

Because it was anticipated that the special court would enter a final judgment in the Valuation Case during the summer of 1984, CJI, on June 25, 1984, petitioned this court for supplemental proceedings[1] to approve a proposed plan of distribution of the proceeds awarded by the special court (the Valuation Proceeds) and for further instructions. Objections to the CJI petition and proposed plan of distribution were filed by other parties interested in the CNJ reorganization, and hearings in the supplemental proceedings were held on August 13 and 22, 1984.

On July 23, 1984, the special court entered a final judgment on CNJ's compensation claims. In that decision it was determined that the value of the assets conveyed by CNJ and certain of its affiliated companies was $42,509,299. Of this amount, $40,874,734 is allocable to the assets conveyed by CNJ and $1,634,565 is

---

**1.** Order No. 965 specifically provides in paragraph 23(e) that the court shall retain jurisdiction of the reorganization proceedings to, among other things, "determine the fairness of any settlement of the Valuation Case ... and to approve programs for the distribution and/or liquidation of the Valuation Case Proceeds ... pursuant to the Plan."

allocable to its affiliates. The final judgment directed the delivery to CJI of certificates of value (CVs) having the face amount of $40,874,734, and bearing interest from April 1, 1976, at 8 percent *per annum,* compounded annually until redeemed. Redemption of the CVs is at the option of the United States Railway Association (USRA), the issuer, but must occur no later than December 31, 1987. It was calculated that as of October 1, 1984, the distribution date proposed by the CJI petition, the amount of principal plus accrued interest would bring the total Valuation Proceeds available for distribution to $80,-210,260.[2]

CJI, together with Oppenheimer & Co. as holder of certain of the outstanding notes issued by CJI, took the position that the special court's award grossly undervalued the assets. Accordingly, CJI stated its intention to appeal the final judgment in the Valuation Case, which, under the Rail Act, may be taken directly to the Supreme Court, 45 U.S.C. § 719(e)(3). On January 7, 1985, the Supreme Court affirmed the special court's findings in the Valuation Case in their entirety.

Findings and awards have also been made by the commissioners in both of the Condemnation Cases. Condemnation Proceeds now amount to 42,355,900,[3] but these monies are not presently available for distribution due to CJI's appeal of the commissioners' award in the Liberty Park action. That matter has been assigned to the Superior Court of New Jersey, Law Division. The State has cross-appealed the commissioners' decision and at present the parties are engaged in pretrial discovery.

CJI's appeal of the Liberty Park action has not been without objection, however, particularly from Oppenheimer & Co., which has claimed that the appeal raises a serious conflict of interest as to CJI's fiduciary duty towards its security holders. Had the commissioners' decision been left undisturbed, the $2,355,900 award of Condemnation Proceeds would be available immediately to redeem some of the V–1 securities issued by CJI, thus leaving an additional $2,355,900 of Valuation Proceeds available for the redemption of lower priority securities. If, because of the Condemnation Case appeal, however, the Valuation Proceeds are distributed before and Condemnation Proceeds become available for distribution, then the $2,355,900 from the condemnation proceedings will inure solely to the benefit of CJI and the securities owners will receive none of those proceeds.[4]

Such a scenario would indeed raise an eyebrow as to CJI's performance as a fiduciary but, under the present circumstances, it is not an issue which must be confronted. At the time of CJI's petition and Oppenheimer's objections, a final determination and award had not yet been made in either the Valuation Case or the Liberty Park condemnation action.[5] I do not believe that

---

**2.** Of course, this figure is now incorrect since interest has continued to accrue since that time. When a new distribution date is set, the interest will be recalculated to reflect the true amount of Valuation Proceeds available for distribution.

**3.** This figure takes into account the sum of just under $300,000 which was previously awarded in the New Jersey Turnpike condemnation action.

**4.** In support of this position, Oppenheimer has submitted an affidavit which states that the Deputy Attorney General of the State of New Jersey who signed the State's notice of cross appeal indicated that "the State of New Jersey would not have cross appealed and, indeed, would have accepted the Commissioners' decision had [CJI] not appealed." The motivation of CJI in pursuing its appeal of the Condemnation Case is indeed relevant to the conflict-of-interest question, a question which was specifically left open in Judge Whipple's opinion approving the Reorganization Plan. *See* 473 F.Supp. at 233.

**5.** Under the terms of the Valuation Case Proceeds Distribution Agreement, dated September 14, 1979 (Distribution Agreement),

"Conclusion of the Condemnation Cases" means the entry of final orders in the Condemnation Cases, neither of which orders shall have been reversed, stayed, modified or amended and the time to appeal from, seek review or rehearing of each of such orders shall have expired; and

"Conclusion of the Valuation Case" means the later of (a) the date thirty-six months from the latest receipt by CJI of damages, compen-

when the supplemental proceedings were brought before this court the parties contemplated that a decision in the Valuation Case would be so quickly followed by one in the Condemnation Cases. This court's findings as to the proper allocation of proceeds from the Valuation and Condemnation Cases discussed in section II(B) below, however, renders the conflict question and Oppenheimer's position with respect thereto moot.

The plan of distribution proposed in CJI's petition is a modification of the allocation scheme to which it had agreed in 1979. Indeed, any proposal for distribution of the Valuation and Condemnation Proceeds must have at its core the provisions of section 3.02 of the Distribution Agreement, which sets forth the priorities among the various classes of noteholders and the procedures to be followed in the course of distributions to those creditors. CJI's proposed plan, however, fails in several important respects to protect the rights and interests so carefully established under the Reorganization Plan in that it attempts to rearrange the order, and in some cases, even the amounts of payments to be made on the CJI notes. This is impermissible since the Reorganization Plan clearly sets out a strict priority of claims and requires that each class of security issued by CJI must be fully redeemed before the next junior class of notes may be presented for payment. In creating such an allocation scheme, it was the intent of all parties that the Reorganization Plan would provide the most complete payment possible, taking into consideration both seniority of claims and the great number of CJI noteholders.

In rejecting CJI's petition, the court now sets forth guidelines to be followed by CJI in formulating a new distribution plan. As the appeals in the Valuation Case have now been exhausted, the time has come for CJI to resubmit a plan of distribution, which plan must be governed primarily by section 3.02 of the Distribution Agreement and shall incorporate the conclusions of law on the five issues concerning the Valuation Proceeds discussed in part II of this opinion. In conjunction with its filing of a revised distribution plan, CJI is instructed to set a new distribution date and recalculate the amount of interest payable on all securities as of that date. After ensuring that sufficient sums of Valuation Proceeds have been reserved to provide for the retirement of debt, the amount of which is not known at present, distribution of the Valuation Proceeds and redemption of the CJI notes may commence in accordance with the guidelines set forth in this opinion.

B. *The Reorganization Plan Approved September 13, 1979*

In order to fully understand the findings set forth in this opinion, and to see how they evolved from the conflicting positions of CJI, Oppenheimer & Co., and the State of New Jersey, it is necessary to go back and re-examine the provisions of the Reorganization Plan. As Judge Whipple noted in 1979, the Reorganization Plan

basically seeks to achieve three laudable goals. First, it seeks to create a reorganized company around the retained assets of the estate and, recognizing that such assets are insufficient to satisfy all administration and secured claims, to dedicate (with the consent of prior claimants) the ownership of such company to the secured creditors in partial satisfaction of their claims. Second, realizing that the size of the valuation recovery is presently indeterminate, it seeks to pre-

---

sation or other proceeds (or a denial of the right to any such damages, compensation or other proceeds) resulting from a final order which has not been reversed, stayed, modified or amended and the time to appeal from which or to seek review or rehearing of which has expired, in the proceedings before the Special Court. ... or (b) the later of the dates twelve months from the latest receipt by CJI of dam-

ages, compensation or other proceeds (or a denial of right to any such damages, compensation or other proceeds) resulting from a final order which has not been reversed, stayed, modified or amended and the time to appeal from which or to seek review or rehearing of which has expired, in certain actions authorized by the CJI Board of Directors.

serve the opportunity of all to receive satisfaction on their claims until the valuation recovery is received and provides for the application of such proceeds to the unsatisfied claims in accordance with proposed priorities. Finally, it seeks to resolve on a compromise basis a broad range of disputed issues which might otherwise need be litigated if the Amended Plan were not implemented.

473 F.Supp. at 230.

The claims of the three principal administrative and secured creditors of CNJ (*i.e.*, the United States, the State of New Jersey and the general mortgage bondholders) represent the vast majority of the approximately $163 million in claims against CNJ. Other claims consist of amounts owed on local taxes, pre-bankruptcy unsecured and six-month claims, administration expenses, and claims of stockholders in CNJ. The enormity of the claims asserted against the bankrupt's estate made it likely that the low priority claims of the CNJ stockholders would be satisfied only in the event of a very large recovery in the Valuation Case.

In summary, the structure of the Reorganization Plan involves ten classes of noteholders.[6] Holders of the V–1 notes, the highest priority security, may look to either the Condemnation Proceeds or the Valuation Proceeds in satisfaction of their claims; while holders of the V–2, Series A notes, Series C through Series I notes and the Certificates of Contingent Interest may look only to the Valuation Proceeds for payment. Thus, the greater the amount of Valuation Proceeds that is available for distribution, the greater the number of CJI noteholders who will be entitled to redeem their notes in satisfaction of their claims. In keeping with this goal, the determinations I have made in part II today seek to ensure that any plan of distribution entered

into by CJI makes optimum use of the Valuation Proceeds.

## II. *Issues Relating to the Plan of Distribution*

### A. *Certificates of Value*

In examining any plan of distribution, this court must make an initial determination as to whether the CVs which have been issued in the Valuation Case should be treated as securities proceeds or as cash proceeds.[7] If viewed as the latter, the CVs must be allocated immediately since the Distribution Agreement states that within five days after receipt of cash proceeds, the Trustee is to establish a redemption date for the classes of securities to be redeemed, in whole or in part, with Valuation Proceeds received, and CJI must calculate the interest accrued on each class of securities to be redeemed. Thereafter, based on these calculations, the Trustee is to allocate and transfer from the general account to the cash accounts those amounts of cash necessary to redeem the various classes of securities in accordance with the priorities established in the Reorganization Plan and in section 3.02 of the Distribution Agreement. If, however, the CVs are to be viewed as securities proceeds, they may not be distributed immediately, but must be appraised in accordance with article IV of the Distribution Agreement. CJI then shall apply to this court for instructions as to whether to sell such securities proceeds, in whole or in part, at once or over time, or distribute them, in whole or in part, directly to the holders of the notes issued by CJI. In the event that securities proceeds are converted into cash, the net cash proceeds are to be treated in the same manner is if the Valuation Proceeds had been received in the form of cash and are to be allocated and transferred in accordance with section 3.02(b).

---

**6.** A thorough examination of the Reorganization Plan can be found in Judge Whipple's opinion approving that plan. *See* 473 F.Supp. at 228–230.

**7.** As defined in the Distribution Agreement " '*Cash Proceeds*' means Valuation Case Pro-

ceeds in the form of cash or equivalents, including any derived from or in respect of Securities Proceeds.

" 'Securities Proceeds' means Valuation Case Proceeds other than Cash Proceeds."

CJI, Oppenheimer & Co., and the United States all urge that the CVs should be treated as "cash equivalents."[8] In support of this position, they point to the facts that CVs are issued by the USRA and are guaranteed by the Secretary of Transportation, thus making them a general obligation of the United States. Further, they note that if the USRA chooses to exercise its option, the CVs could be redeemed at any time. These parties also find support in the special court's observation that "[t]he value of [the CVs] ... can readily be computed by reference to other Government obligations for which a wide market exists." *Matter of Valuation Proceedings*, 445 F.Supp. 994, 1003 (Special Court 1977). Thus, under this view, CVs can be treated in the same manner as a more common Treasury note.

The crux of CJI's argument, however, is that the changed circumstances resulting from the amendment of the Rail Act in 1981 requires that the CVs be treated as the equivalent of cash. According to the terms of the Rail Act in effect prior to the time of CNJ's transfer of its assets to Conrail, the USRA was to deposit CVs, together with certain shares of Series B preferred stock and common stock of Conrail, with the special court. *See* 45 U.S.C. § 743(a)(1). At that time, the base value of the CVs was to be obtained by taking the net liquidation value (NLV) of the transferred properties as determined by the special court and subtracting the "other benefits" provided by the Rail Act. To this was added any compensable unconstitutional erosion (CUE) of the estate of the railroad in reorganization[9] and interest from the date of transfer to the redemption date at 8 percent *per annum*. The resulting value was then divided by the number of CVs

distributed to the transferor railroad. 45 U.S.C. § 746(c)(4). The Rail Act further provided in pertinent part that

[e]ach certificate of value of each series shall be redeemable for an amount, payable in cash, equal to its base value on the redemption date, minus—

(A) The sum of the fair market value of the Series B preferred stock applicable to such certificate, the fair market value of the common stock applicable to such certificate, and all cash dividends theretofore paid on any such Series B preferred stock and on any such common stock.

45 U.S.C. § 746(c)(2). In 1981, however, Congress repealed the provision requiring deduction of the value of the Conrail securities. *See* Pub.L. No. 97–35 § 1167(b), 95 Stat. 357, 686. As a result, the value of the CVs alone now constitutes the sole exchange provided under the Rail Act for the transferred assets.

CJI argues, however, that the Reorganization Plan and Agreement never contemplated that the character and function of the CVs would change due to amendment of the Rail Act, and urges this court to exercise its discretion to deal with these unanticipated circumstances by declaring that the CVs are cash equivalents rather than securities. *See, e.g., Barco Urban Renewal Housing Corp. v. Housing Authority of Atlantic City*, 674 F.2d 1001 (3d Cir.1982).

At the other end of the spectrum is the State of New Jersey, supporting the view that the CVs are securities. In the hearings accompanying these special proceedings, the State has introduced evidence that the CVs currently have a value of approximately 88 cents on the dollar. Further

---

**8.** While all three of these parties agree regarding the characterization of CVs as cash equivalents, they differ as to the timing of the distribution. CJI would have the CVs distributed immediately upon conclusion of the Valuation Case, regardless of the status of the Condemnation Cases. In contrast, Oppenheimer submits that the CVs should not be distributed until both the Valuation and Condemnation Cases are resolved. Finally, the United States takes no formal position, but notes that a delayed distribution of the CVs could serve to encourage settlement.

**9.** On December 5, 1983, the special court found that the value of "other benefits" provided to CNJ and its affiliates was zero, and the CUE was zero. Thus, the base value of each CV is to be determined simply by dividing the NLV ($42,509,299) by the number of outstanding CVs.

evidence indicates that in the financial community, the CVs would not be considered the equivalent of cash, but would be seen as securities. Finally, while it is true that the USRA has the right to exercise its option to redeem the CVs prior to December 31, 1987, there is no certainty that it would do so. Thus, CJI's reliance on the likelihood of early payment by USRA to support its position that CVs are the equivalent of cash is seriously undercut.

■ While there is no legal precedent to guide my determination as to the nature of the CVs, I believe that the State has presented the more correct view. CVs are definitely not "cash," and this much has been conceded by counsel for CJI at oral argument. Under the accepted view, cash means "ready money, or money in hand, either in current coin or in other legal tender, or in bank-bills or checks paid and received as money, and does not include promises to pay money in the future." *Palliser v. United States*, 136 U.S. 257, 263, 10 S.Ct. 1034, 1035, 34 L.Ed. 514 (1890). It is equally misleading to call the CVs cash equivalents. For tax purposes, it has been held repeatedly that "a note promising payment of cash in the future is not cash or its equivalent." *Battelstein v. I.R.S.*, 611 F.2d 1033, 1035 (5th Cir.1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981). *See also Don E. Williams Co. v. Commissioner*, 429 U.S. 569, 582–83, 97 S.Ct. 850, 858, 51 L.Ed.2d 48 (1976). Although the CVs have the full backing of the United States government, they remain promises to pay cash at some future date and, therefore, cannot be considered the equivalent of cash. Thus, under the terms of the Distribution Agreement, the CVs are to be considered securities proceeds.

An important factor in my determination has been the equities presented by the facts of this particular case. The State, as holder of the V–1 notes, is CJI's highest priority creditor.[10] In agreeing to the Reorganization Plan in 1979, the State clearly contemplated payment in cash, for in electing option B, it had already agreed to reduce the debt owed to it by CNJ by 45 percent. Treating the CVs as cash proceeds, and distributing them according to face, rather than market, value would thus deprive the State of a significant portion of the amount owed to it. Such a result would violate the goals of the Reorganization Plan and would be unacceptable.

Accordingly, the CVs awarded in the Valuation Case shall be treated as securities proceeds, as that term is defined in the Distribution Agreement. Since the appraisal provisions set forth in section 4.05 of the Distribution Agreement are not appropriate for valuation of the CVs, however, it is necessary that an alternate method of appraisal be determined. A team of three appraisers, one of whom has expertise in the field of government bond trading is to be selected from the financial community and will be named by this court at the time when CJI resubmits its distribution plan. These individuals shall have the task of appraising market value of the CVs as of the new distribution date to be selected by CJI.[11] Based on this appraisal, the CVs shall be sold and the cash proceeds derived therefrom are to be distributed pursuant to article III of the Distribution Agreement according to the schedule of priorities established in the Reorganization Plan and the guidelines which follow.

B. *Redemption of the V–1 Notes*

V–1 notes, in the amount of $6,346,851, held by the State of New Jersey as partial compensation for its tax claims against CNJ are currently outstanding. Under the Reorganization Plan, the V–1 notes are secured by a first lien on both the Condemna-

---

**10.** To the extent the V–1 notes will be paid from the Condemnation Proceeds, such payment will be in cash. To the extent that outstanding V–1s must be paid from the Valuation Proceeds after exhaustion of the Condemnation Proceeds, they will be redeemed for CVs.

**11.** In selecting its proposed distribution date, CJI is instructed to take into account that the appraisal team must be given sufficient time to reach its conclusions. Distribution should commence as soon as practicable thereafter.

tion and Valuation Proceeds. Because at the time that CJI filed its petition in June 1984, it was likely that the Valuation Case would be concluded before the Condemnation Case, CJI's proposed distribution scheme envisioned use of the Valuation Proceeds to redeem the V–1 notes as soon as those proceeds became available. All the other parties to this action objected to this scheme, requesting instead that this court order that the V–1 notes be redeemed from the Condemnation Proceeds.

As indicated above, CJI's proposed use of Valuation Proceeds to redeem the V–1 notes would create a serious conflict of interest between its fiduciary obligations to its noteholders and those to its shareholders. The conflict stems from the fact that of all the securities issued by CJI under the Reorganization Plan, only the V–1 notes create a lien on both the Condemnation and Valuation Proceeds. All other noteholders can only look to the Valuation Proceeds as security for their notes. The result of using the Valuation Proceeds to redeem the V–1 notes would be twofold: First, it would reduce the amount of Valuation Proceeds available at a later date to satisfy the claims of more junior creditors; and second, since no other notes have a lien on the Condemnation Proceeds, they would remain unused and would inure to the benefit of CJI's own shareholders at such time that the Condemnation Case has been concluded. Because control of the Valuation Case was left to CJI, other interested parties feared from the outset that they would be prejudiced if CJI settled the Valuation Case cheaply once its own interests in the bankrupt CNJ had been satisfied. As a result, CJI's own shareholders would benefit from the windfall of Condemnation Proceeds. It was recognition of this concern that prompted Judge Whipple to retain jurisdiction in this court until a settlement and/or distribution of the Valuation Proceeds had been completed.

■ There is no question that the Reorganization Plan contemplates use of Condemnation Proceeds to redeem the V–1 notes if these proceeds become available first. CJI argues that the plan does not provide for the possibility that the Valuation Case would be concluded first and, arguing that this is now the situation with which we are presented, urges the court to accept its distribution scheme. I cannot agree with this approach. The language of the Reorganization Plan and related agreements makes it clear that Valuation Proceeds are to be used to redeem V–1 notes only "to the extent that such notes are not satisfied out of the Condemnation Proceeds." *See, e.g.,* ¶ II(C) & (G) of Reorganization Plan at 4 & 6; §§ 3.05, 3.06, 6.07 of Distribution Agreement. There is nothing to indicate that the V–1 notes should be redeemed from whatever proceeds are first made available. Rather, an unambiguous priority is set forth—to the extent they are available, Condemnation Proceeds shall be used to redeem V–1 notes. Any shortfall is to be made up through the use of Valuation Proceeds. I cannot approve CJI's proposal where it so directly contradicts intentions expressed in documents to which all parties agreed.[12]

■ As it stands now, the Valuation Proceeds are woefully insufficient to repay all the creditors of CNJ. It is the duty of this court to ensure that the Valuation Proceeds are distributed in such a way that the maximum number of creditors is able to partake, and at least recoup a small part of their loss resulting from the railroad's bankruptcy. In order to reach such a result, I look to the equitable doctrine of marshalling of assets, which rests upon the principle that a creditor having two funds to satisfy his debt must apply them in a manner so as not to defeat another creditor who is entitled to resort to only one of the available funds. *Meyer v. United States,*

---

**12.** At first blush, CJI's proposal to use Valuation Proceeds to redeem the V–1 notes if the Valuation Case shall conclude first is a tempting one, for it proposes action in a case which has been caught in the litigation process for so many years. The loss to CJI's junior noteholders resulting from such a distribution would be so great, however, that such a hasty redemption would be unwise.

375 U.S. 233, 236, 84 S.Ct. 318, 320, 11 L.Ed.2d 293 (1963); *Farmers & Merchants Bank v. Gibson*, 7 B.R. 437, 439 (Bkrtcy.N. D.Fla.1980). As a practical matter, the doctrine requires the senior creditor, having two funds to satisfy its debt, to first resort to the one fund which is not subject to the demand of a junior creditor. *In re Frank Meador Buick, Inc.*, 31 B.R. 28, 29 (Bkrtcy.W.D.Vir.1983). The purpose of this rule is to avoid the inequity which would result from the election of a senior creditor to satisfy its demand out of the only fund available to the junior creditor, thereby excluding the junior creditor from any satisfaction of its debt.

In the present circumstances, both the marshalling doctrine and general principles of equity require that the V–1 notes be redeemed out of the Condemnation Proceeds. To the extent that such proceeds are insufficient to redeem all of the approximately $6.3 million outstanding V–1 notes, the Valuation Proceeds are to be used to make up the shortfall. Currently, there are approximately $300,000 in Condemnation Proceeds now available from the Turnpike case. If the $2.1 million awarded by the commissioners in the Liberty Park case is left undisturbed on appeal, at the conclusion of that appeal, there would be sufficient Condemnation Proceeds to redeem approximately one third of the outstanding V–1 notes. The remaining two thirds then must be drawn from the Valuation Proceeds.

Accordingly, CJI is instructed to await the outcome of the Condemnation Case appeals before redeeming any of the V–1 notes. Since the conclusion of the Valuation Case has occurred prior to judgment in the Condemnation Case, it will be necessary to reserve sufficient funds from the Valuation Proceeds to redeem all outstanding V–1 notes. This shall provide for the possibility that the condemnation award may be reduced on appeal. The amount of $6 million from the Valuation Proceeds (the sum representing the difference between the Turnpike Condemnation Proceeds and the V–1 debt) is to be put into an interest-bearing escrow account as of the distribu-

tion date selected by CJI. At the conclusion of the Condemnation Case appeals, all Condemnation Proceeds are to be used to redeem as many more V–1 notes as possible. If the Condemnation Proceeds are still insufficient to redeem all outstanding V–1 notes, CJI is to resort to the escrowed case from the Valuation Proceeds in order to retire the remaining V–1 debt. Any Valuation Proceeds left in the escrow fund after full retirement of the V–1 debt shall be transferred to the general account for allocation pursuant to section 3.02 of the Distribution Agreement.

## C. *The Newark Bay Bridge*

One of the more hotly contested issues in the CNJ reorganization concerns the removal of the Newark Bay Bridge which was formerly owned by CNJ. In a settlement agreement entered into on September 14, 1979, CNJ agreed to acknowledge ownership of the bridge solely for the purpose of facilitating its removal. In return, the United States agreed to remove the bridge, which the United States Coast Guard had determined was a navigational hazard. Reimbursement for the removal costs incurred by the government was to be obtained from the Valuation Proceeds in the form of Series D notes.

The United States claims that it has already spent $5,060,092.25 to remove the center span of the bridge and estimates that the total cost of completing the removal project will be $14 million. These amounts, however, are contested, as are a wide range of other issues, including the Government's compliance with its contractual obligations in removing the bridge, the extent to which further demolition is necessary, and the liability of the CNJ estate for reimbursement of the Government's past and future claims. Due to the complexities of the legal and factual issues raised in the bridge controversy, I shall refer the entire matter to a special master. In this way, resolution of other questions in this proceeding and ultimately the distribution of proceeds itself need not be further delayed by the extremely time-consuming process

of unravelling the bridge issues. I shall file with this opinion an order appointing the Honorable Morris Pashman, retired justice of the New Jersey Supreme Court, as special master. Within two weeks of this appointment, all parties are to submit to the court a set of issues relating to the Newark Bay Bridge controversy to be decided by the special master.

■ In light of my appointment of a special master, CJI's proposal to establish a separate "bridge company" which would hold all right, title and interest in the bridge, as well as assume responsibility for its removal, must be rejected as premature. Any such divestiture of CJI's interest in the bridge must await the special master's findings, to be issued after proceedings in which all parties have had an opportunity to prosecute their claims.

■ The referral of the bridge issues to a special master raises an additional question which must be resolved at this time. Because the proceeds distribution scheme set forth in the Reorganization Plan contemplates full redemption of the Series D notes before any more junior class of notes may be redeemed, it would be impossible to carry out full distribution of the Valuation Proceeds until the amount of Series D notes payable has been determined by the special master. In order to avoid further delay in the Valuation Proceeds distribution, it is necessary to set aside a reserve of funds from the Valuation Proceeds to provide for reimbursement of the Government's expenses. It would be meaningless to go through the motions of litigating over additional reimbursement for future bridge dismantlement expenditures if no proceeds have been set aside to use as compensation. The proceeds which may be required to reimburse the Government for its expenses cannot be given away while the amount recoverable remains in dispute. At the same time, however, since the purpose of appointing a special master is to work towards a speedy resolution of this entire reorganization proceeding, there is no reason that, once the Government's interests have been properly protected, distribution

of any remaining Valuation Proceeds may not continue.

To date no Series D notes have been issued by CJI to the United States, although the Government has requested that CJI issue such notes in the amount of $5,060,092.25, plus accrued interest, for removal costs already incurred. Further, since it is now a fact that the bridge removal will not be completed prior to the conclusion of the Valuation Case, the United States submits that, pursuant to section 3.03(b) of the Distribution Agreement, a reserve fund of $12.3 million in Series D notes, plus accrued interest, be created for expenses not yet expended but required for completion of the bridge removal. The figures proposed by the Government, however, now exceed their original target figure of $14 million for the bridge project by more than $4 million, and I find little, if any, support in the record to justify this increased estimate of removal costs. As it is far from clear that even the original amount proposed will be awarded to the United States at the conclusion of the proceedings before the special master, I find that a reserve fund of $14 million, plus accrued interest, will more than adequately protect the Government's interests.

At such time that Valuation Proceeds have been received by the Trustee and distribution to the noteholders has commenced, the United States shall certify, as required by section 3.03(b) of the Distribution Agreement, that the total expenditures for the bridge removal will amount to $14 million. This amount of Valuation Proceeds is then to be transferred to the Series D note account. The Trustee is directed to follow the procedures set forth in section 3.03 regarding the appropriate treatment to be given to cash and securities proceeds, but is not to redeem any Series D notes whatsoever until completion of the proceedings before the special master. When the special master fixes the amount of Series D notes to which the United States is entitled, payment of this amount plus accrued interest may be made from the Series D note account. Any Valuation Proceeds remain-

ing in the Series D note account after reimbursement of total removal costs has been made shall be transferred back to the general account for allocation pursuant to section 3.02 of the Distribution Agreement.

### D. *Reimbursement for CJI's Advances*

■ Paragraph 11 of CJI's petition seeks payment of nearly $3.4 million (including interest) from the Valuation Proceeds for advances that CJI has expended as of May 31, 1984, and will expend in prosecuting the Valuation Case, including all appeals, and the proceedings in this court. Objectors to CJI's proposal argue that the CNJ subsidiaries which have shared in the Valuation Case award should participate in paying the costs of the litigation through which they received their proceeds. In this way, CJI noteholders would not be required to bear the full burden of financing this lengthy litigation. I am completely in accord with the position that the CNJ subsidiaries should participate in paying the litigation costs, since requiring the CJI noteholders to shoulder the entire expense of prosecuting these cases is inconsistent with the intent of the Reorganization Plan. It is only just that the CNJ subsidiaries, which derived a benefit from the recovery in the Valuation Case, should be required to pay a reasonable share of the expenses incurred, even if, as alleged by CJI, their actual expenditures were *de minimis*. For "where a party has by its own effort and expense created or preserved a fund which benefits others … it would be unjust to require one party to bear the entire expense which necessarily results in a benefit to a large class of persons." *Kahan v. Rosenstiel*, 424 F.2d 161, 165–66 (3d Cir. 1970), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970).

My attempt to ascertain precisely how much of the litigation costs should be allocated to the CNJ subsidiaries has been frustrated, however, because the parties have supported their positions with only the vaguest of assertions. CJI has represented that although the subsidiaries' portion of the recovery was nearly 4 percent (a figure which itself has been disputed), their expenses were minimal and therefore it would not be unfair to ask the CJI noteholders to pay the entire amount. The United States asks only that the subsidiaries be required to pay a "reasonable" share of the litigation expenses, regardless of the amount they actually incurred, because of the benefits the subsidiaries derived from the recovery in the special court. The United States, however, estimates "reasonable" as being anywhere from 3 percent to 11 percent of the advances. Finally, Oppenheimer & Co. argues that at least 11.2 percent of the litigation expenses are allocable to the subsidiaries. The most extensive documentation that has been submitted by any party to bolster its position is a lone affidavit filed by counsel for CJI. Of this, only three-and-one-half pages are devoted to supporting a claim for over $3 million. Such a showing is simply inadequate.

Accordingly, at this time I shall limit my determination to finding that the CNJ subsidiaries benefitting from the Valuation Case recovery will be required to contribute a reasonable share of the litigation expenses claimed by CJI. Calculation of the total amount of advances payable as well as the percentage of that amount which is to be paid by the subsidiaries must be made at a later date due to the inadequacy of the proofs received thus far. Now that the special court's award in the Valuation Case has been upheld, CJI is instructed to submit to the court within three months detailed documentation in support of its claim for advances, together with a break-down of the expenses and recoveries chargeable to the CNJ subsidiaries. The other parties shall also have the opportunity to object or otherwise respond to CJI's claim provided that any such response is also accompanied by the appropriate supporting documents. The parties are reminded that no distribution to CJI noteholders may be accomplished until the amount of advances payable by the subsidiaries has been determined and are urged to avoid any further unnecessary delay.

### E. *Escheat of Certain Series E and Series F Notes*

On September 15, 1984, approximately $555,591 of Series E notes, plus accrued interest, and approximately $653,094 of Series F notes, plus accrued interest, which had not been claimed by noteholders escheated to CJI, in accordance with paragraph 14(d) of order No. 965. It is CJI's intention to be paid the full amount of principal and interest on these escheated securities from the Valuation Proceeds.

█ Under the circumstances presented by these reorganization proceedings, however, permitting the CJI shareholders to receive what amounts to a windfall of nearly $1.8 million is not an acceptable result. The fact that the creditors for whom the Series E and F notes were intended have failed to claim them should be an opportunity to be seized by CJI to retire these securities without using precious Valuation Case proceeds. The $1.8 million in Valuation Proceeds so conserved can then be distributed to the next eligible CJI noteholders, creditors who have patiently awaited some measure of recovery on their investments in CNJ for so many years. Current shareholders of CJI, which is a vital, ongoing entity, shall not be permitted to gain a profit at the expense of others who can only look to the Valuation Proceeds for compensation.

### III. *Conclusion*

The petition submitted by CJI on June 25, 1984, is denied. Instead, CJI is instructed to submit a revised plan of distribution within two months. Such plan must incorporate the findings set forth in this opinion. In summary, Condemnation Proceeds are to be distributed to holders of the V–1 notes according to the terms set forth in section II(B) of this opinion. Valuation Proceeds are to be allocated according to the provisions of section 3.02 of the Distribution Agreement, subject to the following modifications and/or clarifications:

(1) The CVs awarded by the special court are to be considered securities proceeds, governed by article IV of the Distribution Agreement. This court shall appoint a team of three appraisers to determine the value of the CVs.

(2) The Series V–1 notes shall be payable from the Condemnation Proceeds at the conclusion of the Condemnation Cases. To the extent that such proceeds are insufficient to redeem all outstanding V–1 notes, the Valuation Proceeds are to be used to complete the V–1 redemption and, to reserve sufficient funds for this contingency, $6 million of Valuation Proceeds is to be put in an interest-bearing escrow account prior to the time that CJI commences its distribution of Valuation Proceeds.

(3) Valuation Proceeds amounting to $14 million, plus accrued interest, shall be escrowed during the pendency of the Newark Bay Bridge proceedings before the special master. Any proceeds in excess of those which the special master has determined are payable to the United States on the Series D note debt shall be made available for distribution to more junior noteholders.

(4) CNJ subsidiaries must pay a reasonable share of the litigation advances claimed by CJI. Advances properly payable to CJI shall be payable from the Valuation Proceeds. The parties are to submit detailed documentation supporting their claims regarding the amount and allocation of these expenses.

(5) Those Series E and Series F notes which escheated to CJI on September 15, 1984, may not be redeemed from the Valuation Proceeds.

This court shall continue to retain jurisdiction over these proceedings until the conclusion of the Condemnation Case, the completion of the Newark Bay Bridge proceedings, and the implementation of a final plan of distribution. Within 15 days, counsel for CJI shall submit an order embodying the instructions contained in this opinion, except for the order appointing a special master to oversee the Newark Bay Bridge proceedings, which accompanies this opinion.